**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **GROUPCHATTER, LLC** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 6:16-cv-00382** |
| | § | |
| **FACEBOOK, INC.,** | § | |
| **Defendant.** | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff GroupChatter, LLC alleges for its First Amended Complaint for patent infringement against Defendant Facebook, Inc. the following:

**THE PARTIES**

1. Plaintiff GroupChatter, LLC ("GroupChatter") is a Texas limited liability company with its headquarters and principal place of business at 1400 Preston Road., Suite 475, Plano, Texas 75093.

2. GroupChatter owns and licenses patents in the group communications field relating to technology that enables users to perform deterministic group messaging and leverage IP networks to enable content sharing across mobile and fixed networks.

3. Facebook, Inc. is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, California 94025. Facebook may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

**JURISDICTION AND VENUE**

4. GroupChatter brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). Defendant does business in this judicial district, has committed acts of infringement in this judicial district, has purposely sought and transacted business in this judicial district involving the accused products and/or has regular and established places of business in this judicial district.

6. Facebook is registered to do business in Texas, regularly does business in Texas, and files Texas franchise tax reports.

7. Facebook maintains an office in Austin, Texas, and is building a data center in Fort Worth, Texas.

8. Facebook generates substantial revenue from advertising sales to customers in Texas and has many Facebook users, including users of the Facebook Accused Products, in the Eastern District of Texas.

9. Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Texas Long-Arm Statute, due at least to its substantial business in this State and judicial district, including: (A) at least part of its infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold and services provided to Texas residents.

## GROUPCHATTER PATENTS

10. GroupChatter asserts that Facebook infringes, directly and indirectly, U.S. Patent Nos. 7,945,249, 9,014,659, 8,588,207, and 9,294,888 (the "GroupChatter Asserted Patents").

11. The GroupChatter Asserted Patents relate to methods, apparatuses, and systems for providing acknowledged, deterministic mass messaging over a two-way wireless network ('659, '207, and '888 patents) and socially networking a plurality of mobile terminal users in

order to share published personal content among a set of users and further provide for notifications and acknowledgements rating such content ('249 patent).

**GroupChatter '659, '207, and '888 Patents**

12. The GroupChatter Asserted '659, '207, and '888 Patents describe a two-way communication system and method providing acknowledged responses to group messages to enable deterministic group messaging within the claimed network architecture and addressing scheme.

13. "Deterministic" group messaging refers to one of the advantages delivered by the inventions. Using the claimed system offers the potential benefit of providing timely updates for and from endpoints within a group. In operation, these endpoints (e.g., PDUs, smartphones, pagers, and, in M2M systems, utility meters, transponders, etc.) send responses to group messages and thereby provide data from which to determine the status of each endpoint.

14. Broadly speaking, GroupChatter accuses Facebook of infringement for providing, operating, testing, and using the Facebook product and features known as Facebook, Facebook.com, m.Facebook.com, Facebook Messenger, Facebook Groups (which works in Facebook Messenger and Facebook), Facebook Safety Check, and Facebook Live (collectively the "Facebook Accused Products").

15. The inventors noted in the patent specification that certain communication networks, even those with endpoint devices capable of acknowledging group messages, failed to provide the valuable advantage of deterministic communication because they provided no way to maintain status of each group member. This left administrators lacking important data about the status of each group member.

16. To solve this problem and other shortcomings of prior two-way wireless messaging networks, the inventors conceived a novel combination for maintaining group

management information and organization for use on wireless network. They describe in the GroupChatter Patents how to build and deploy the network architecture to use it and achieve these benefits.

17. In the Facebook Asserted Claims ('659, '207, and '888 patents), grouped endpoints are identified by information about the user or specific endpoint device and by groups that particular recipient belongs to. In addition to the two-way wireless architecture of the radio network, a client/server-based architecture is provided for communication between a network client and the two-way wireless network.

18. Through client/server interactions, a user is provided up-to-date group information that may include address information, status information pertaining to a message or command response, overall group detail and status, or even specific information about endpoints within a group.

19. In operation, an exemplary embodying system stores recipient identifiers, one or more group identifiers for each recipient endpoint, and group membership data that identifies which recipients belong to specific groups. An endpoint may belong to multiple groups and thus may be associated with multiple group identifiers.

20. A group message is initiated via a network client and wirelessly transmitted to endpoint devices located anywhere within the range of the wireless network infrastructure. Endpoints are configured to receive a group messages and respond with status information, alphanumeric text entries, or other information based upon the message and endpoint device status.

21. Efficient group management and maintenance is an advantage of the claimed system and is demonstrated in operation of the claimed invention by reference to and

communication with selected endpoints and groups of endpoints that each have a subset of the group information data stored locally.

22. FIG. 1 of the '207 Patent (reproduced below) depicts in general terms a network that embodies one or more claims:




FIG. 1

23. As shown, exemplary structural elements for an embodied system include: (1) a network client 20; (2) a network switch or server 12 coupled to a receiver database 18; (3) a wireless network 14; and (4) a plurality of mobile receivers 16 (e.g., smartphones, meters, etc.).

24. As background, the inventors conceived the subject matter of the patents-in-suit in part to address issues in communication networks of the day. For example, some radios and associated wireless networks used by emergency responders were unable to handle the heavy network traffic that circumstances unfortunately required. '207 Patent, col. 1; lines 40-49. The "Background of the Invention" states:

> *"during the events of Sep. 11, 2001, radio channels became oversaturated, and interoperability problems among jurisdictions and agencies persisted throughout the entire response process. Otherwise compatible portable radios were preprogrammed in a manner that precluded interoperability. Cellular telephone systems and even the public switched telephone network (PSTN) became congested and unusable."*

25. During the September 11 tragedy, older pager systems proved more reliable than cell phone networks. But while pager-based systems had the potential to be relatively robust in emergency circumstances, such systems of the time were unable to efficiently process group messages (i.e., messages to groups of recipients) and track the individual responses to know which members of the group had responded. The Background of the Invention section of the specification states:

> *"none of these systems provide a network interface sufficient to support acknowledged group messaging. Requiring that the message originator individually alert each recipient adds considerable setup delay when alerting large groups."*

26. Accordingly, the inventors conceived the invention(s) to address these problems. The result was a novel system that efficiently used limited bandwidth and network resources to effectively communicate with selected endpoints groups whose membership may be dynamically created and adjusted. Even in these conditions, the inventors sought to provide effective group management and improved network efficiency, operability, and reliability (based on the challenges of the time).

27. The Facebook Asserted Claims ('659, '207, and '888 patents) require, among other things, a specific network architecture that may includes at least: wireless network (e.g., a cellular network) infrastructure (e.g., base stations, backhaul, transmitters, receivers, antennae, and central switch), and multiple network clients (e.g., smartphones equipped with two-way wireless communication modules for communicating on the wireless network).

28. The subject matter of the system and method claims asserted against Facebook are tied to the structural deployment described in the GroupChatter Patents and address shortcomings in group management and communication that the inventors experienced before

their invention.

29. In operation, the Facebook Asserted Claims detail how a message originator, who may lack knowledge of specific details regarding a particular endpoint group, is provided group information to the network client. Such information may include membership information for each group, the number of recipient endpoints sharing a group identifier, or an identifier shared by certain recipient endpoints within a group.

30. The claims recite a specific method for providing this information. The Facebook Asserted Claims ('659, '207, and '888 patents) describe and recite the source of group and recipient endpoint information, how and when it is transmitted to a network client, and how it may be displayed and updated at the network client.

31. In an example scenario where an incident commander is seeking assistance over a pager network, a notification feature can provide the commander (i.e., the message originator) details about the number, identities, and statuses of group members. Using the invention for this feature, the commander is able to determine based upon the group messaging system information, a status of group members. Without this feature, an incident commander may have insufficient context to know whether enough personnel were being summoned, or whether key individuals had been mobilized.[1]

32. By using the claimed addressing scheme described in the GroupChatter Patents, Facebook and other infringers are able to communicate to ad hoc or dynamically organized groups of users.

33. Additional meaningful claim elements in the Facebook Asserted Claims include: (1) providing recipient identifier and group identifier information for each group to which a

---

[1] *See* '207 Patent: col. 2, lines 22-26.

recipient is a member; and (2) storing acknowledgement data for each group member that lists them and indicates their response (e.g., "…*storing acknowledgement data in the memory device for each of the group members, the acknowledgement data comprising a listing of each of the group members and an indication of response for each of the group members*"). In previous systems, referring again to the incident commander's scenario for example, after a volunteer group was alerted by pager, the incident commander would not know who was going to respond until personnel began to arrive on scene. In contrast, with the claimed "deterministic" group messaging systems, incident commanders (or group administrators) are updated in response to the group messages dispatched. Responses are linked to endpoint recipients within the group context, an advantage and novel advancement achieved by the inventive group management scheme. In this way, the inventive systems and methods provide a valuable concrete result: deterministic status information provided to a network client device for groups of endpoint recipients across a two-way wireless communication network.

34. Accordingly, the Asserted Facebook Claims ('659, '207, and '888 patents) are directed to a specific two-way wireless architecture appended with a group management and maintenance system based upon group and recipient identifiers for identifying with and selectively communicating with endpoint recipients across the network.

35. Acknowledged group messaging may be performed in ways and across architectures that differ from the claimed subject matter. While the advantages of the inventions likely will not be achieved, two-way messaging with selective groups of endpoints and management of such groups may be performed using other methods such as frequency division across the geographical region or focused transmission, encryption, or having multiple radios in the network infrastructure for communicating with predetermined groups based upon location.

36. The Facebook Asserted Claims provide structure and limit the invention to particular and novel ways of deterministically messaging selective groups of recipients on a two-way wireless communication network. These structural limitations describing architecture, integrated computer-based operations necessary to practice the patent claims (e.g., database tables, communication at network client with server/switch), wireless network protocol capable of communicating with groups, and endpoints that can receive and interpret those signals provide meaningful structural limitations that one of skill in the art would recognize as distinctions between network types.

37. The operations, function, and results of the subject matter of the Facebook Accused Products cannot be carried out and achieved by a human or generic computer or by using a generic two-way wireless radio network.

38. Generic computer networks or wireless two-way radio networks do not perform "group communication and response tracking" or "group management and maintenance" as those general concepts are claimed in the Facebook Asserted Claims.

39. Some of the major advantages of the claimed systems and advances over the prior art are discussed in the specification (centralized management and administration of groups and recipients' relationships with groups, effectively communicating with multiple endpoints in groups, and tracking status across a network by group). One skilled in the art at the time of the inventions would further recognize additional advantages including management of groups across a dispersed area or networks, tracking status information of recipient groups including whether individual group members have receiver or read a group message, and monitoring this information at a dispatch center.

40. By the novel combination of its two-way wireless network architecture, group

management and maintenance scheme, and deterministic messaging functionality, the GroupChatter Patents present a specific, inventive solution to the problem the inventors recognized with messaging networks at the time of their invention.

41. Facebook realizes substantial value from its use of the claimed subject matter. Facebook provides users the ability to connect with specific sets of users, like family, teammates, or co-workers to share updates, photos, messages, and documents.

**GroupChatter '249 Patent**

42. The GroupChatter Asserted '249 Patent describes socially networking a plurality of mobile terminal users in order to share published personal content among users and provide notifications and acknowledgements rating such content. The invention of the '249 Patent facilitates a social networking system that works seamlessly across both fixed networks (e.g., a local area network) and mobile networks (cellular networks). (*See* '249 patent, ABSTRACT).

43. The inventors of the GroupChatter Asserted '249 Patent (Bobby Fanelli, William Dyer, David Girard, and Roberto Quintana) leveraged an IP mobile network and a fixed network to provide real-time or near real-time communication and content sharing among mobile terminal users.

44. At the time of invention, the feature set on a fixed network (e.g., accessed by a desktop computer) was different from features now commonly performed on mobile devices. For example, a YouTube user could post videos to the Internet; however, his friends could only access the content from a fixed network. (*See* '249 patent, col. 1, lines 24-35). Such access to a friend's posted content was not easily provided over cellular networks. Instead, mobile handset users communicated with each other primarily using only voice calls and text messages. In some cases, a mobile handset user could provide location information to his friends, but at the time of the invention, such services required manual registration with a provider's website. In any event,

such services that existed at the time of the invention did not allow users to share their user-generated content (e.g., photos, video) over mobile networks (*See* ’249 Patent, col. 1, lines 33 - 41) as contemplated in the ’249 Patent.

45. Within this technological landscape, the inventors recognized a need for better social networking technology. The inventors leveraged an IP mobile network and a fixed network to provide what was, at the time, a next generation social networking experience that included real-time communication and content sharing to users of mobile terminals. As recited in the claims and described in the patent specification, the ’249 Patent invention enables a complex feature set, where users receive friend updates (regarding posts, messages, etc.) in real time on both mobile and fixed networks.

46. Claim 1 of the ‘249 Patent recites a method for socially networking including enabling a mobile terminal user to: (1) set up and view a personal list of other mobile terminal users; (2) view presence information indicating selected other mobile terminal users; (3) establish communications with one or more of the other users; (4) view posted content obtained by other mobile terminal users; (5) receive a pop-up notification on a television/computer when other users publish new personal content; and (6) interact with the television/computer to view and rate the new personal content. As the ’249 Patent describes, performing the method requires complex back-end servers, subsystems, programming, and mobile terminals to provide users real-time access to information (e.g., the location, presence, status and preferences for their friends).

47. The claimed invention is necessarily rooted in computer and communication technologies and improves the functioning of these systems using complex schemes for communicating between and across mobile and fixed platforms. The ’249 patent describes

example hardware/software environments in its FIG. 1, reproduced below:




48. In the above figure (FIG. 1 from the '249 Patent), the social networking system (item 100) includes mobile users (items 102a, 104a, and 106a) that carry mobile terminals (items 102b, 104b, and 106b). The system includes a presence server (item 108), an application server (item 110), and a database (item 113). The system further includes an IMS core (item 112) and a streaming video server (item 114). As shown, the presence server (108) is coupled via LAN (116a) to the server 110, which is coupled via LAN (item 116b) to the IMS core (112), which in turn is coupled via mobile networks (118a and 118b) to enable wireless IP connectivity to the mobile terminals through wireless technologies including CDMA, Wi-Fi, WiMAX, GPRS, and UTMS. (*See* '249 Patent, col. 3, lines 20 – 30). In addition, the IMS core (item 112) is coupled to the streaming video server (item 114), which is coupled to mobile networks (items 118a and 118b). The video server (item 114) is also coupled via a network connection to a set-top box

(item 122) and a television/computer (item 124).

49. In operation, the overall system leverages the IP (e.g., IMS) mobile network (items 112, 118a, and 118e) and a fixed network (items 108, 110, and 114) to provide a next generation social network experience to the users (e.g., item 102a, 104a, and 106a). The mobile terminals (items 102b, 104b, and 106b) implement a standalone application (item 126) which enables their users to perform a variety of steps recited in the claims.

50. In an exemplary scenario, a user wishes to know whether a friend is present on the network. Accordingly, the user first logs into his mobile application and registers with remote a server (’249 Patent, col. 4, lines 14 - 28). In an embodiment described in ’249 Patent, logging in and registering requires several preconditions including: (1) the IMS core (an IMS proxy platform) is running; (2) the mobile terminal has an IP connection to the IMS proxy platform; (3) the user has not yet registered with the remote server; (4) the mobile terminal is not running the mobile application.

51. After logging in and registering, the ’249 patent contemplates several potential actions by the mobile terminal user including: (1) establishing a voice call (’249 patent, col. 5, line 25 – col. 6, line 24); participating in an Instant Messaging (IM) session (’249 patent, col. 6, line 25 - col. 7, line 24); establishing a voting queue (’249 patent, col. 7, line 25 – col. 8, line 55); participating in a scorekeeper scenario (e.g., for scoring photographs) (’249 Patent, col. 8 line 57 – col. 9 , line 48); and viewing a map of associates (’249 patent, col. 9, line 49 - line 41). This functionality and the other aspects of the ’249 patent claims were not known at the time of the invention.

52. In addition to the specialized network components required, the ’249 Patent requires specialized mobile components. For example, one embodiment specifies a mobile

terminal (e.g. phone) with a user interface (e.g., operating system), a camera, and an application that enables the user to: (1) set up and view friend lists; (2) monitor presence information of friends; (3) establish electronic communications with other mobile terminal users; and (4) view content obtained and posted by other mobile terminal users. *See* '249 Patent col. 1, line 63 - col. 2 line 6. The mobile terminals are specially programmed (via an application) to communicate through mobile networks with servers that, in turn, communicate to update users via their computers/televisions. In this way, groups of users are updated in real time across multiple platforms, and each device is synchronized with the most relevant and current data.

**FACEBOOK & FACEBOOK.COM**

53. Defendant Facebook, Inc. operates Facebook, which is an online social networking service. A user registers to the site, creates a user profile, and adds other users as "friends." Facebook users can exchange messages, share status updates, share photos, share videos, chat, video call, group share, call, and receive various notifications. Users can join groups, follow users, follow Pages, and otherwise communicate with other users. Facebook is available via web browser (from fixed computers, laptops, mobile devices, or media devices) at www.facebook.com and www.m.facebook.com. Facebook is available via apps (for fixed computers, laptops, mobile devices, or media devices) for various platforms including iOS, Windows Phone, Android, BlackBerry OS, and Mac OS X.

54. Viewing Posted Content - Facebook provides multiple ways for users to view posted content from other users. For example, each Facebook user has a Facebook "Profile," which is a user's collection of the photos, stories and experiences that tell that user's "story." A Facebook Profile also includes the user's Timeline, which is where the user can see in real-time and chronological order the posts that pertain to the user. Similar to Profiles or Timelines for individuals, Facebook "Pages" are for businesses, brands and organizations to share their stories

and connect with people. Like Profiles, users can customize Pages by publishing stories, hosting events, or adding apps. A user that "likes" a Page can get updates in his "News Feed." Facebook "Paper" shows content similar to a newspaper or magazine. For example, Paper has different sections made up of stories (e.g., news headlines, sports, style, etc.).

55. Communicating and Sending Messages - Facebook users can communicate with friends, fellow users, and group members in a variety of formats including through posts, tags, messages, chats, calls, Group Photos, Group Messages, Group Events, Group Files, and Group Docs. A tag links a person, Page or place to something a user posts (e.g., a status update or a photo). For example, a user can "tag" a photo to say who is in the photo. Alternatively, a user can "tag" a status update to indicate multiple users are visiting a location.

56. Personal Lists and Groups – Facebook enables users to organize fellow users using personal lists and groups (including with group identifiers). Facebook "Lists" including "Friend Lists" are a way to organize friends and other users. A user can use lists to filter the stories he sees in his News Feed or post an update for specific people (e.g., a group, coworkers, or friends who live nearby). Friends can be easily categorized according to custom lists and default categories of: "Close Friends," "Acquaintances," and "Restricted." Facebook automatically creates and updates smart lists based on profile information a user and his friends (or fellow users) have in common (e.g., work, school, family, city). Facebook "Nearby Friends" is a feature allows users to see their friends and whether they are nearby. If a user activates the Nearby Friends feature, he can locate his friends or receive notifications when his friends are nearby. Facebook "Groups" permits users to communicate with (e.g., broadcast a group message to) specific sets of people (e.g., for family, teammates or coworkers). Groups are dedicated spaces that allow users to share updates, photos or documents and message other group

members. There are three privacy options (e.g., open, closed, and secret) for each group, and administrators can set permissions for who can post and respond within a group. "Groups for Schools" is available to students and faculty of a college or university. When a user joins a group within the school community, he can share files, create events, message other members, and stay up-to-date on school events.

57. Acknowledging, Responding to, and Rating Content - Facebook enables users to view and rate new personal content provided by other users. For example, "Liking & Reacting" permits a user to provide feedback (e.g., ratings) and connect with things they care about. Clicking "Like" below a post on Facebook indicates that a user enjoys the post without leaving a comment. "Reacting" allows a more specific response than "liking." To react to a post, a user hovers over "Like" and chooses a reaction. "Ratings & Reviews" allow users to rate a product or service offered by a Facebook Page based on personal experience. In addition to rating content, Facebook enables sending polls and multiple choice questions to groups. Users can select from multiple choice options.

58. Notifications – Facebook provides various notifications to users regarding posts, responses, and acknowledgments. For example, pop-up notifications alert a user (if the user is logged in) when a friend interacts with the user's content (e.g., posts on the user's Timeline). Facebook users receive text and graphical notifications from their browser or app (i.e., network client) to alert them of any relevant posts, messages, calls, and other content. Facebook also provides real-time presence notifications and the read status for group and individual messages.

**FACEBOOK LIVE**

59. Facebook Live initially allowed users to receive video streams only from Facebook staff members and celebrities, for example. In early 2016, Facebook opened up the feature to all United States users. A broadcaster communicates with groups and can see how

many people are watching, their names, and their feedback (e.g., comments). A user can subscribe to a person's broadcasts and receive notifications when the person "goes live."

60. Facebook provides "Best Practices" to users of Facebook Live via www.facebook.com/facebookmedia/best-practices/live.

61. Facebook's Best Practice #4 for Facebook Live users encourages them to enable other users of mobile terminals to "follow" them to enable viewing of presence information and establish communication and view posted content:




62. After the broadcast, a video is stored on a person's timeline for future viewing.

**FACEBOOK SAFETY CHECK**

63. Launched in October 2014, Facebook Safety Check is a feature provided by Facebook for use in emergency situations. With Safety Check, Facebook determines which users may be located near a disaster and pings the user for his or her status. This allows people to quickly share that they are safe with friends and family during a disaster. Safety Check further allows a user to share what he knows about a friend or family member's safety status.

64. Safety Check provides deterministic messaging by dispatching a group message to users known to be in an area, and processes acknowledgements to the message to determine the status of nearby users.

65. Once a user responds and is marked "safe," Facebook publishes a notice of the acknowledgement through News Feed and notifications to the user's Facebook friends.

66. The inventors described in the specification the importance of a system capable of acknowledging group messages, providing information to a network interface about "who has been alerted and how they have replied, as well as information concerning those who cannot be reached." *See* '959 at col. 2, lines 32-35.

67. Facebook activated Safety Check in June 2016 after a gunman killed dozens of people nightclub in Orlando, Florida.

68. Facebook activated Safety Check in Texas, on July 7, 2016, after a sniper shot several police officers during protests in downtown Dallas.

**FACEBOOK MESSENGER**

69. Facebook Messenger ("Messenger") is a service that allows Facebook users to share content (e.g., maps, photos, videos, stickers) and communicate (e.g., voice call, video call, and Instant Message) with each other. Facebook Messenger is available via web browser at www.messenger.com and via apps for at least iOS, Windows Phone, Android, BlackBerry OS, Mac OS X, Microsoft Windows, and Firefox.

70. Facebook Messenger enables people to reach others instantly and seamlessly integrates with Facebook messaging functionality on personal computers and mobile devices.

71. Facebook Messenger users see when their message is delivered to their friend's phone and when their friend has seen it.




72. Facebook touts Messenger's capability to let users "know when messages are delivered and seen" on their website at https://www.messenger.com/features.

73. Facebook Messenger indicates when a message is received, when a message is read, and whether a response has been sent.

## FACEBOOK APPLICATIONS

74. Facebook apps (e.g., for Facebook and Facebook Messenger) are pre-installed or available for download and installation on smartphones from the Apple App Store, Google Play, and others. In addition, Facebook apps come pre-installed or are available on media players and smart televisions. By providing these apps and operating Facebook infrastructure and systems, (e.g., Facebook Mobile, Facebook.com, Messenger, Safety Check, and Facebook Live, and features described herein), Facebook provides the Facebook Accused Products.

## FACEBOOK TERMS OF SERVICE

75. Facebook publishes terms of service at https://www.facebook.com/terms.

76. Facebook users are required to comply with Facebook's terms of service.

77. Facebook's Terms of Service include "Special Provisions Applicable to Software."

78. One such provision states, "You will not modify, create derivative works of, decompile, or otherwise attempt to extract source code from us, unless you are expressly permitted to do so under an open source license, or we give you express written permission."

**COUNT I**
**(INFRINGEMENT OF U.S. PATENT NO. 7,945,249)**

79. GroupChatter incorporates paragraphs 1 through 78 herein by reference.

80. GroupChatter is the owner, by assignment, of U.S. Patent No. 7,945,249 (the "'249 Patent"), titled "NEXT GENERATION SOCIAL NETWORKING AND CONTENT RATING SYSTEM AND METHOD."

81. A true and correct copy of the '249 Patent is attached as Exhibit A.

82. As the owner of the '249 Patent, GroupChatter holds all substantial rights in and under the '249 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

83. The United States Patent Office granted the '249 Patent on May 17, 2011.

84. The '249 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

85. Facebook has known about the '249 Patent since at least 2014 and since GroupChatter filed its original complaint on April 26, 2016.

86. In October 2014, during prosecution of Facebook's patent application titled "Prompting social Networking System Users in a Newsfeed to Provide Additional User Profile Information," the Patent Examiner cited GroupChatter's '249 Patent as pertinent prior art.

87. Again in October 2014, during prosecution of Facebook's patent application titled

"Mobile Device Based Messaging," the Patent Examiner cited GroupChatter's '249 Patent as pertinent prior art.

88. In June 2015, Facebook listed GroupChatter's '249 Patent on an Information Disclosure Statement submitted to the Patent Office in connection with Facebook's patent application titled, "Method and System for Messaging Across Cellular Networks and a Public Data Network."

89. Facebook has directly and indirectly infringed and continues to infringe the '249 Patent by practicing one or more claims of the '249 Patent, including at least claims 1, 2, 3, 4, 6, 7, 8, 10, 12, 13, and 14, by making, using, providing, deploying, and monetizing the Facebook Accused Products including Facebook.com, Facebook Messenger, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions.

90. Facebook has directly and indirectly infringed and continues to infringe the '249 Patent by practicing one or more claims of the '249 Patent, including at least claims 1, 7, 13, and 14 by deploying, testing, and operating Facebook.com, Facebook Messenger, Facebook Mobile, and Facebook Apps and associated subsystems that provide a social network for mobile terminal users to view lists of users and their availability to communicate.

91. By operating and providing Facebook.com, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps, Facebook performs methods for socially networking a plurality of mobile terminal users. A mobile terminal user can setup and view lists of friends, view presence information indicating the availability of other users, establish communications with other users, view posted content obtained by other users, receive pop-up notifications on a television/computer when other users publish new content, and interact with the television/computer to view and rate the published content.

92. Facebook knowingly induces users to infringe the asserted claims by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook system, Facebook, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions.

93. Facebook provides step-by-step instructions to users of the Facebook system, Facebook, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions.

94. Facebook has been knowledgeable about the claimed subject matter of the ’249 Patent since at least 2014 when the Patent Examiner cited it during prosecution of a Facebook patent application.

95. Facebook was knowledgeable about the scope and content of the ’249 Patent when it identified the ’249 Patent on an Information Disclosure Statement submitted to the Patent Office.

96. Facebook’s instructions direct users how to operate the Facebook system, Facebook, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions, as Facebook intends, knowing that Facebook users will directly infringe the ’249 Patent by performing the functions and carrying out the operative steps described here.

97. Facebook intends users to operate the Facebook system, Facebook, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions and perform the functions and carry out the operative steps described here.

98. Facebook’s prior analysis and knowledge of the ’249 Patent combined with its

detailed instructions to users demonstrate Facebook's knowledge that the induced acts constitute infringement of the '249 Patent.

99. Facebook benefits financially from usage of the Facebook system, Facebook, Facebook Messenger, Facebook.com, Facebook Mobile, and Facebook Apps for phones, tablets, computers, media players, and smart televisions

100. Claims 7 and 14 recite mobile terminals having a user interface, camera, and a processor implementing an application for setting up and viewing a personal list, viewing presence information of other users, establishing communications with other users, viewing posted content obtained by other users and performing related actions as recited in the claims.

101. Facebook directly infringes claims 7, 14 and their asserted dependent claims when it tests theses functions using mobile terminals to interact with Facebook.com, Facebook Messenger, Facebook Mobile, and Facebook Apps.

102. End users of Facebook directly infringe claims 7, and 14 and their asserted dependent claims by using mobile terminals (e.g., smartphones) covered by these claims.

103. Facebook contributes to Facebook users' direct infringement of claims 7 and 14 (and their asserted dependents) of the '249 Patent by providing an application (Facebook and Messenger applications, collectively "the application") enabling end users to setup and view personal lists, view presence information, establish communications, view posted content obtained by other users, publish that a photo or video has been taken, and notify other users about the photo or video, and send the photo or video to a server that enables distribution. The application is a component of a patented apparatus and constitutes a material part of the invention.

104. Since at least October 2014, Facebook has known the application is especially

made or especially adapted for use in infringing the ’249 Patent. The application along with its relevant functionality is not a staple article or commodity of commerce suitable for substantial non-infringing use. Despite having such knowledge, Facebook continues to provide applications and interfaces for infringing mobile terminals (e.g., phones, tablets, computers) and induce, deploy, encourage, aid, and abet others to directly infringe the asserted claims of the ’249 Patent.

105. The application, including the particular software components provided by Facebook that provide the accused functionality and carry out the operations described here, has no substantial non-infringing use. Facebook designed the software components, maintains and develops them, and intends they be used, for infringing the ’249 Patent. The application software components have no purpose other than infringement.

106. Defendant designed and developed Facebook.com, Facebook Messenger, Facebook Mobile, and Facebook Apps, including their associated subsystems, to be implemented by a processor to enable a Facebook user to view lists of users and their availability to communicate.

107. The purpose of the application software is to deliver functionality to a user enabling her to setup and view a personal list which includes other users of other mobile terminals; view presence information which indicates availability of the other users of other mobile terminals; establish communications with one or more other users of other mobile terminals; and view posted content obtained by at least one of the other users.

108. A further purpose of the application software is to publish that a photo or video has been taken by a user and send the photo or video to a Facebook server for subsequent distribution to other users of other mobile terminals upon their accepting a notification of the photo or video.

109. Since it became aware of the ’249 Patent, Facebook has made no effort to modify the accused products in a way that would avoid infringement or deactivate infringing features.

110. Facebook’s prior analysis and knowledge of the ’249 Patent combined with its knowledge of how the application is used and Facebook’s collaboration with mobile device manufacturers and developers demonstrate Facebook’s knowledge and intent that the application will be combined with other hardware and software to infringe the ’249 Patent.

111. GroupChatter has been damaged as a result of Defendant’s infringing conduct described in Count 1. Facebook is liable to GroupChatter in an amount that adequately compensates it for their infringement, which amount, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

112. Facebook’s infringement of the ’249 Patent has been willful, and consequently Facebook is liable to GroupChatter for enhanced damages.

**COUNT 2**
**(INFRINGEMENT OF U.S. PATENT NO. 8,588,207)**

113. GroupChatter incorporates paragraphs 1 through 112 herein by reference.

114. GroupChatter is the owner, by assignment, of U.S. Patent No. 8,588,207 (the “’207 Patent”), titled “METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING.”

115. A true and correct copy of the ’207 Patent is attached as Exhibit B.

116. As the owner of the ’207 Patent, GroupChatter holds all substantial rights in and under the ’207 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

117. The United States Patent Office granted the ’207 Patent on November 19, 2013.

118. The ’207 Patent is valid, enforceable and was duly issued in full compliance with

Title 35 of the United States Code.

119. Facebook is practicing one or more claims of the ’207 Patent, including at least claims 1, 2, 3, 5, 6, 8, 9, 11, and 12, by making, using, offering for sale, selling, and/or importing the Facebook Accused Products and their subsystems that provide a deterministic group messaging system through which Facebook users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

120. Facebook has directly infringed and continues to infringe the ’207 Patent by deploying, testing, using, and operating the Facebook Accused Products to provide acknowledged group messaging to users and perform acknowledged group messaging.

121. The Facebook Accused Products operate on smartphones, laptops, tablets, and other mobile devices and may communicate using cellular and/or Wi-Fi networks.

122. Facebook Accused Products such as Messenger and Facebook.com provide users the ability to start group conversations and exchange messages among members of a group using mobile devices operating on wireless networks.

123. Facebook Usernames and User IDs are part of a user’s public profile. Facebook uses this information to help people find users and to organize a user’s information internally on the Facebook servers.

124. In Messenger, a user selects the “Create New Group” button to create a group having a group identifier or “Group Name” and including members having recipient identifiers:




125. Network clients such as a Facebook App, Facebook Messenger App, or a browser engaged in a session with Facebook.com or m.Facebook.com transmit to the Facebook server system a request for wireless transmission of a group message.

126. Group information is transmitted by the Facebook server system to a network client. Such group information relates to the group address, group membership, and/or recipient identifying information.

127. Facebook Accused Products broadcast group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

128. Facebook Accused products receive acknowledgement responses from group members via the wireless network being used by the respective user's device.

129. In Facebook Messenger, for example, a message initiating user will see when her message is delivered and when the recipient user sees it.

130. The Facebook Accused Products provide acknowledgement responses indicating

to the network client who has seen the group message and who among group members has not.




Messenger App Screenshot

131. Users may respond to group messages in the Facebook Accused Products with emoticons, messages, or read indicators sent from their mobile device.

132. When membership changes in a Facebook group, membership data on the Facebook server system is updated along with affected users' mobile devices.

133. Since April 26, 2016, Facebook has induced and contributed to direct infringement of the '207 Patent by users of the Facebook Accused Products.

134. Since GroupChatter filed its Original Complaint on April 26, 2016, Facebook has known about the '207 Patent and the specific infringing acts alleged by GroupChatter.

135. Facebook induces its users to directly infringe the '207 Patent by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook Accused Products by providing detailed, step-by-step instructions to Facebook users through online tutorials and user guides.

136. Facebook's step-by-step instructions direct users of the Facebook Accused

Products to perform the functions and carry out the operations described here.

137. Since learning about the ’207 Patent, GroupChatter’s infringement allegations, and the specific acts accused of infringing the ’207 Patent, Facebook has made no effort to modify its instructions or the Facebook Accused Products to avoid infringement.

138. Facebook has not deactivated the functionality of the Facebook Accused Products identified in GroupChatter’s Complaint as infringing the ’207 Patent.

139. Facebook has provided no instructions to Facebook users about how to avoid infringing the ’207 Patent.

140. Facebook’s knowledge of the ’207 Patent and GroupChatter’s infringement allegations against the Facebook Accused Products combined with its knowledge of the Facebook Accused products and how they are used to infringe the ’207 Patent, consistent with Facebook’s instructions, demonstrate Facebook’s specific intent to induce Facebook users to infringe the ’207 Patent.

141. Facebook contributes to direct infringement by providing the Accused Product software and software components to mobile device makers, network carriers, and users of the Facebook Accused Products enabling Facebook users to make a deterministic group messaging system through which they exchange group messages over communication networks.

142. Facebook knows and intends for these Facebook Accused Product components will be combined with hardware (e.g., a mobile device or smart phone, laptop computer, tablet) including a processor, radio transceivers, and display and input devices to provide users the ability to view and create groups, send group messages, and receive and view responses to group messages.

143. The Facebook Accused Product software components that provide the accused

functionality and carry out the operative steps described here are designed and developed by Facebook for the purpose of providing the accused functionality described here. They have no other substantial use but to infringe the ’207 Patent, and Facebook knows they are especially adapted for and made to infringe the ’207 Patent.

144. Despite having knowledge of GroupChatter’s infringement allegations and the ’207 Patent, Facebook continues to provide applications and interfaces for use with mobile devices, smart phones, computers, laptops, and tablets, etc.

145. Facebook designed the software components, maintains and develops them, and intends they be used, for infringing the ’207 Patent, consistent with Facebook’s instructions and the manner in which Facebook knows the Accused Products will be used by Facebook users.

146. Facebook designed and developed the Facebook Accused Products, including the particular software components and systems that carry out the infringing functions, to be implemented in a system for deterministic group messaging as claimed in the asserted claims.

147. The primary purpose of the Accused Product software components is to provide acknowledged group messaging over a wireless network by storing and providing recipient and group information, recipient and group identifiers, and group membership data and enable wireless transmission of group messages, monitoring for responsive transmissions and store acknowledgement data relating to group members which data may include indication of a response, when a message has been received, or when a response has been read by a recipient.

148. A further related purpose of the Accused Product software components is to enable a user to update group and recipient identifiers, group membership, and propagate such updated information to mobile devices on the network.

149. The sole purpose of the Facebook Accused Product software components accused

here is to infringe the ’207 Patent, and since this case was filed Facebook has made no effort to change or modify the software to avoid infringement.

150. Facebook’s knowledge of the ’207 Patent combined with its knowledge of how the application is used and Facebook’s collaboration with mobile device manufacturers and developers demonstrate Facebook’s knowledge and intent that the application will be combined with other hardware and software to infringe the ’207 Patent.

151. As a result of Facebook’s infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that adequately compensates it for Facebook’s infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT 3**
**(INFRINGEMENT OF U.S. PATENT NO. 9,014,659)**

152. GroupChatter incorporates paragraphs 1 through 151 herein by reference.

153. GroupChatter is the owner, by assignment, of U.S. Patent No. 9,014,659 (the “’659 Patent”), titled “METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING.”

154. A true and correct copy of the ’659 Patent is attached as Exhibit C.

155. As the owner of the ’659 Patent, GroupChatter holds all substantial rights in and under the ’659 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

156. The United States Patent Office granted the ’659 Patent on April 21, 2015.

157. The ’659 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

158. Facebook is practicing one or more claims of the ’659 Patent, including at least

claims 1, 2, 3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, and 17, by making, using, offering for sale, selling, and/or importing the Facebook Accused Products and their subsystems that provide a deterministic group messaging system through which Facebook users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

159. Facebook has directly infringed and continues to infringe the '659 Patent by deploying, testing, using, and operating the Facebook Accused Products to provide acknowledged group messaging to users and perform acknowledged group messaging.

160. Facebook has indirectly infringed the '659 Patent by contributing to and inducing infringement by Facebook users since April 26, 2016.

161. The Facebook Accused Products operate on smartphones, laptops, tablets, and other mobile devices and may communicate using cellular and/or Wi-Fi networks.

162. Facebook Accused Products such as Messenger and Facebook.com provide users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

163. Facebook stores on its servers data relating to recipients, groups created by users, and group membership information.

164. Facebook Usernames and User IDs are part of a user's public profile. Facebook uses this information to help people find users and to organize a user's information internally on the Facebook servers.

165. Group information such as group membership and recipient identifying data stored on the Facebook servers is provided to mobile devices running a Facebook Accused Product client application.

166. In Messenger, a user selects the "Create New Group" button to create a group

having a group identifier or "Group Name" and including members having recipient identifiers.

167. Group messages are transmitted wirelessly to mobile devices corresponding to each recipient in the selected group.

168. Mobile devices running a Facebook client application receive a group message and respond with acknowledgement of receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

169. Acknowledgement data for each group member is stored in memory for each group member.

170. Messages are sent to Facebook Accused Product clients based on stored acknowledgement data.

171. Facebook Accused Products broadcast group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

172. Facebook Accused products receive acknowledgement responses from group members via the wireless network being used by the respective user's device.

173. In Facebook Messenger, for example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

174. Users send personal messages using the Facebook Accused Products.

175. The Facebook Accused Products provide acknowledgement responses indicating to the network client who has seen the group message and who among group members has not.

176. Users may respond to group messages in the Facebook Accused Products with emoticons, messages, or read indicators sent from their mobile device.

177. When membership changes in a Facebook group, membership data on the Facebook server system is updated along with affected users' mobile devices.

178. The Facebook Accused Products provide acknowledged group messaging.

179. Facebook servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

180. Group information is stored on user's mobile devices.

181. When a group message is initiated, a Facebook Accused Product client application causes wireless transmission of a group message to mobile devices corresponding to group recipients, and mobile devices receiving the group message transmit a response.

182. Facebook partners with mobile network operators to provide group messaging capability used to deliver services and communicate with network customers:

**What services does Facebook offer mobile operators?**

Facebook partners with mobile operators to help them deliver Facebook data to their customers at a reduced price or for free.

Operators are given access to our Mobile Partner Portal, where they can:

- Launch discounted pricing programs for Facebook
- Set up Facebook texts (SMS) for their customers
- Gain insights about their customers
- Enable pre-fill information to make it easier for customers to sign up

183. In operation, a Facebook Accused Product client application monitors group message information relayed by Facebook servers for group message responses and stores acknowledgement data comprising responses for each group member and information about message status.

184. Facebook knowingly induces others, namely Facebook Mobile Partners, to infringe the '659 asserted claims by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook Accused Products.

185. Facebook has been aware of the GroupChatter Asserted Patents at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, Facebook continues to sell, deploy, test, use, and encourage, aid, and abet others to directly infringe the asserted claims of the ’659 Patent.

186. Since GroupChatter filed its Original Complaint on April 26, 2016, Facebook has known about the ’659 Patent and the specific infringing acts alleged by GroupChatter.

187. Facebook induces its users to directly infringe the ’659 Patent by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook Accused Products by providing detailed, step-by-step instructions to Facebook users through online tutorials and user guides.

188. Facebook’s step-by-step instructions direct users of the Facebook Accused Products to perform the functions and carry out the operations described here.

189. Since learning about the ’659 Patent, GroupChatter’s infringement allegations, and the specific acts accused of infringing the ’659 Patent, Facebook has made no effort to modify its instructions or the Facebook Accused Products to avoid infringement.

190. Facebook has not deactivated the functionality of the Facebook Accused Products identified in GroupChatter’s Complaint as infringing the ’659 Patent.

191. Facebook has provided no instructions to Facebook users about how to avoid infringing the ’659 Patent.

192. Facebook’s knowledge of the ’659 Patent and GroupChatter’s infringement allegations against the Facebook Accused Products combined with its knowledge of the Facebook Accused products and how they are used to infringe the ’659 Patent, consistent with Facebook’s instructions, demonstrate Facebook’s specific intent to induce Facebook users to

infringe the ’659 Patent.

193. Facebook contributes to direct infringement by providing the Accused Product software and software components to mobile device makers, network carriers, and users of the Facebook Accused Products enabling Facebook users to make a deterministic group messaging system through which they exchange group messages over communication networks.

194. Facebook knows and intends for these Facebook Accused Product components will be combined with hardware (e.g., a mobile device or smart phone, laptop computer, tablet) including a processor, radio transceivers, and display and input devices to provide users the ability to view and create groups, send group messages, receive and view responses to group messages, and determine a type of message to send based upon acknowledgement data.

195. The Facebook Accused Product software components that provide the accused functionality and carry out the operative steps described here are designed and developed by Facebook for the purpose of providing the accused functionality described here. They have no other substantial use but to infringe the ’659 Patent, and Facebook knows they are especially adapted for and made to infringe the ’659 Patent.

196. Despite having knowledge of GroupChatter’s infringement allegations and the ’659 Patent, Facebook continues to provide applications and interfaces for use with mobile devices, smart phones, computers, laptops, and tablets, etc.

197. Facebook designed the software components, maintains and develops them, and intends they be used, for infringing the ’659 Patent, consistent with Facebook’s instructions and the manner in which Facebook knows the Accused Products will be used by Facebook users.

198. Facebook designed and developed the Facebook Accused Products, including the particular software components and systems that carry out the infringing functions, to be

implemented in a system for deterministic group messaging as claimed in the asserted claims.

199. The primary purpose of the Accused Product software components is to provide acknowledged group messaging over a wireless network by storing and providing recipient and group information, recipient and group identifiers, and group membership data and enable wireless transmission of group messages, monitoring for responsive transmissions and store acknowledgement data relating to group members which data may include indication of a response, when a message has been received, or when a response has been read by a recipient.

200. A further related purpose of the Accused Product software components is to enable determining a type of message to send to a receipient or group of recipients based upon stored message acknowledgement data and wirelessly transmitting the message.

201. A further related purpose of the Accused Product software components is to enable a user to update group and recipient identifiers, group membership, and propagate such updated information to mobile devices on the network.

202. These are the only substantial uses for the Facebook Accused Product software components, and they infringe the ’659 Patent.

203. Since this case was filed Facebook has made no effort to change or modify the Facebook Accused Product software to avoid infringement.

204. Facebook’s knowledge of the ’659 Patent combined with its knowledge of how the application is used and Facebook’s collaboration with mobile device manufacturers and developers demonstrate Facebook’s knowledge and intent that the application will be combined with other hardware and software to infringe the ’659 Patent.

205. As a result of Facebook’s infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that

adequately compensates it for Facebook's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT 4**
**(INFRINGEMENT OF U.S. PATENT NO. 9,294,888)**

206. GroupChatter incorporates paragraphs 1 through 205 herein by reference.

207. GroupChatter is the owner, by assignment, of U.S. Patent No. 9,294,888 (the "'888 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

208. A true and correct copy of the '888 Patent is attached as Exhibit D.

209. As the owner of the '888 Patent, GroupChatter holds all substantial rights in and under the '888 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

210. The United States Patent Office granted the '888 Patent on March 22, 2016.

211. The '888 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

212. Facebook is practicing one or more claims of the '888 Patent, including at least claims 1, 2, 3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 16, and 17, by making, using, offering for sale, selling, and/or importing the Facebook Accused Products and their subsystems that provide a deterministic group messaging system through which Facebook users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

213. Facebook has directly infringed and continues to infringe the '888 Patent by deploying, testing, using, and operating the Facebook Accused Products to provide acknowledged group messaging to users and perform acknowledged group messaging.

214. Facebook has indirectly infringed the '888 Patent by contributing to and inducing

infringement by Facebook users since April 26, 2016.

215. The Facebook Accused Products operate on smartphones, laptops, tablets, and other mobile devices and may communicate using cellular and/or Wi-Fi networks.

216. Facebook Accused Products such as Messenger and Facebook.com provide users the ability to start group conversations and exchange messages among members of a group via mobile devices operating on wireless networks.

217. Facebook stores on its servers data relating to recipients, groups created by users, and group membership information.

218. Facebook Usernames and User IDs are part of a user's public profile. Facebook uses this information to help people find users and to organize a user's information internally on the Facebook servers.

219. Group information such as group membership and recipient identifying data stored on the Facebook servers is provided to mobile devices running a Facebook Accused Product client application.

220. In Messenger, a user selects the "Create New Group" button to create a group having a group identifier or "Group Name" and including members having recipient identifiers.

221. Group messages are transmitted wirelessly to mobile devices corresponding to each recipient in the selected group.

222. Mobile devices running a Facebook client application receive a group message and respond with acknowledgement of receipt, an alphanumeric text reply, and/or indication the group message has been received but not read by the user.

223. Acknowledgement data such as confirmation of receipt, a read receipt, or indication a reply was sent is stored in memory.

224. Messages are sent to Facebook Accused Product clients based on stored acknowledgement data.

225. Facebook Accused Products broadcast group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

226. Facebook Accused products receive acknowledgement responses from group members via the wireless network being used by the respective user's device.

227. In Facebook Messenger, for example, a message-initiating user will see when her message is delivered and when the recipient user sees it.

228. Users send personal messages using the Facebook Accused Products.

229. The Facebook Accused Products provide acknowledgement responses indicating to the network client who has seen the group message and who among group members has not.

230. Users may respond to group messages in the Facebook Accused Products with emoticons, messages, or read indicators sent from their mobile device.

231. When membership changes in a Facebook group, membership data on the Facebook server system is updated along with affected users' mobile devices.

232. The Facebook Accused Products provide acknowledged group messaging.

233. Facebook servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

234. Group information is stored on user's mobile devices.

235. When a group message is initiated, a Facebook Accused Product client application causes wireless transmission of a group message to mobile devices corresponding to group recipients, and mobile devices receiving the group message transmit a response.

236. Facebook partners with mobile network operators to provide group messaging capability used to deliver services and communicate with network customers:

> ### What services does Facebook offer mobile operators?
>
> Facebook partners with mobile operators to help them deliver Facebook data to their customers at a reduced price or for free.
>
> Operators are given access to our Mobile Partner Portal, where they can:
>
> - Launch discounted pricing programs for Facebook
> - Set up Facebook texts (SMS) for their customers
> - Gain insights about their customers
> - Enable pre-fill information to make it easier for customers to sign up

237. In operation, a Facebook Accused Product client application monitors group message information relayed by Facebook servers for group message responses and stores acknowledgement data comprising an indication that the group message was received, a group message was read, or a reply was sent by the recipient.

238. Facebook knowingly induces others, namely Facebook Mobile Partners, to infringe the ’888 asserted claims by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook Accused Products.

239. Facebook has been aware of the GroupChatter Asserted Patents at least since the filing of this suit and has had specific knowledge of its infringing conduct. Despite having such knowledge, Facebook continues to sell, deploy, test, use, and encourage, aid, and abet others to directly infringe the asserted claims of the ’888 Patent.

240. Facebook induces its users to directly infringe the ’888 Patent by encouraging, aiding, and abetting the use, deployment, installation, and operation of the Facebook Accused Products by providing detailed, step-by-step instructions to Facebook users through online tutorials and user guides.

241. Facebook's step-by-step instructions direct users of the Facebook Accused Products to perform the functions and carry out the operations described here.

242. Since learning about the '888 Patent, GroupChatter's infringement allegations, and the specific acts accused of infringing the '888 Patent, Facebook has made no effort to modify its instructions or the Facebook Accused Products to avoid infringement.

243. Facebook has not deactivated the functionality of the Facebook Accused Products identified in GroupChatter's Complaint as infringing the '888 Patent.

244. Facebook has provided no instructions to Facebook users about how to avoid infringing the '888 Patent.

245. Facebook's knowledge of the '888 Patent and GroupChatter's infringement allegations against the Facebook Accused Products combined with its knowledge of the Facebook Accused products and how they are used to infringe the '888 Patent, consistent with Facebook's instructions, demonstrate Facebook's specific intent to induce Facebook users to infringe the '888 Patent.

246. Facebook contributes to direct infringement by providing the Accused Product software and software components to mobile device makers, network carriers, and users of the Facebook Accused Products enabling Facebook users to make a deterministic group messaging system through which they exchange group messages over communication networks.

247. Facebook knows and intends for these Facebook Accused Product components will be combined with hardware (e.g., a mobile device or smart phone, laptop computer, tablet) including a processor, radio transceivers, and display and input devices to provide users the ability to view and create groups, send group messages, receive and view responses to group messages, and send group messages via Wi-Fi, WiMAX, or cellular networks.

248. The Facebook Accused Product software components that provide the accused functionality and carry out the operative steps described here are designed and developed by Facebook for the purpose of providing the accused functionality described here. They have no other substantial use but to infringe the ’888 Patent, and Facebook knows they are especially adapted for and made to infringe the ’888 Patent.

249. Despite having knowledge of GroupChatter’s infringement allegations and the ’659 Patent, Facebook continues to provide applications and interfaces for use with mobile devices, smart phones, computers, laptops, and tablets, etc.

250. Facebook designed and developed the Facebook Accused Products, including the particular software components and systems that carry out the infringing functions, to be implemented in a system for deterministic group messaging as claimed in the asserted claims.

251. Facebook designed the software components, maintains and develops them, and intends they be used, for infringing the ’888 Patent, consistent with Facebook’s instructions and the manner in which Facebook knows the Accused Products will be used by Facebook users.

252. Facebook designed and developed the software components to be used in accordance with Facebook’s instructions and in combination with wireless communication networks.

253. Facebook tests the Accused Products to ensure operability on mobile devices and cellular networks.

254. The primary purpose of the Accused Product software components is to provide acknowledged group messaging over a wireless network by storing and providing recipient and group information, recipient and group identifiers, and group membership data and enable wireless transmission of group messages, monitoring for responsive transmissions and store

acknowledgement data relating to group members which data may include indication of a response, when a message has been received, or when a response has been read by a recipient.

255. A further related purpose of the Accused Product software components is to enable determining a type of message to send to a recipient or group of recipients based upon stored message acknowledgement data and wirelessly transmitting the message.

256. A further related purpose of the Accused Product software components is to enable a user to update group and recipient identifiers, group membership, and propagate such updated information to mobile devices on the network.

257. These are the only substantial uses for the Facebook Accused Product software components, and they infringe the ’888 Patent.

258. Since this case was filed Facebook has made no effort to change or modify the Facebook Accused Product software to avoid infringement.

259. Facebook’s knowledge of the ’888 Patent combined with its knowledge of how the application is used and Facebook’s collaboration with mobile device manufacturers and developers demonstrate Facebook’s knowledge and intent that the application will be combined with other hardware and software to infringe the ’888 Patent.

260. As a result of Facebook’s infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that adequately compensates it for Facebook’s infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 5
## (INFRINGEMENT OF U.S. PATENT NO. 8,588,207 BY FACEBOOK SAFETY CHECK)

261. GroupChatter incorporates paragraphs 1 through 260 herein by reference.

262. GroupChatter is the owner, by assignment, of U.S. Patent No. 8,588,207 (the "'207 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

263. A true and correct copy of the '207 Patent is attached as Exhibit B.

264. As the owner of the '207 Patent, GroupChatter holds all substantial rights in and under the '207 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

265. The United States Patent Office granted the '207 Patent on November 19, 2013.

266. The '207 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

267. Facebook is practicing one or more claims of the '207 Patent, including at least claims 8, 9, 10, 12, and 13 by making, using, offering for sale, selling, and/or importing the Facebook Safety Check system and its subsystems that provide a deterministic group messaging system through which Facebook users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

268. Facebook has directly infringed and continues to infringe the '207 Patent by deploying, testing, using, and operating Facebook Safety Check to provide acknowledged group messaging to users and perform acknowledged group messaging.

269. Facebook Safety Check operates on smartphones, laptops, tablets, and other mobile devices that may communicate using cellular and/or Wi-Fi networks.

270. Facebook Safety Check provides users the ability to alert a group of recipients

using mobile devices operating on wireless networks.

271. Facebook stores information about user's location, home area, and current area to send Safety Check interrogations based upon user information stored on the Facebook servers.

272. Facebook Safety Check creates groups of recipients and assigns group identifiers corresponding to recipient groups comprising selected members based upon stored information about location and usage.

273. Mobile devices corresponding to group recipients are provided with information about recipients such as members in the affected area, their recipient identifying information, group members marked safe, and members who have yet to respond.




274. A Facebook Safety Check control module is configured to wirelessly transmit a

group message to recipient user devices and monitor for responses.

275. Responses and acknowledgement data is stored for each group member.

276. Mobile devices are updated with current data from the Safety Check control module.

277. The processing device in the Safety Check control module comprises a processing device at a Safety Check dispatch center to transmit a group message and monitor responses.

278. Facebook Safety Check transmits to the Facebook server system a request for wireless transmission of a group message.

279. Group information is transmitted by the Facebook server system to the Safety Check dispatch center. Such group information relates to the group address, group membership, and/or recipient identifying information.

280. Facebook Safety Check broadcasts group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

281. Facebook Safety Check receives acknowledgement responses from group members via the wireless network being used by the respective user's device.

282. Facebook Safety Check provides acknowledgement responses indicating to the network client who has check in to the group message and who among group members has not.

283. Users may respond to Safety Check group messages with indication of receipt and status.

284. As a result of Facebook's infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that adequately compensates it for Facebook's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT 6**
**(INFRINGEMENT OF U.S. PATENT NO. 9,014,659 BY FACEBOOK SAFETY CHECK)**

285. GroupChatter incorporates paragraphs 1 through 284 herein by reference.

286. GroupChatter is the owner, by assignment, of U.S. Patent No. 9,014,659 (the "'659 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

287. A true and correct copy of the '659 Patent is attached as Exhibit C.

288. As the owner of the '659 Patent, GroupChatter holds all substantial rights in and under the '659 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

289. The United States Patent Office granted the '659 Patent on April 21, 2015.

290. The '659 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

291. Facebook is practicing one or more claims of the '659 Patent, including at least claims 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 15, 17 and 18, by making, using, offering for sale, selling, and/or importing Facebook Safety Check and its subsystems that provide a deterministic group messaging system through which Facebook users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

292. Facebook has directly infringed and continues to infringe the '659 Patent by deploying, testing, using, and operating Facebook Safety Check to provide acknowledged group messaging to users and perform acknowledged group messaging.

293. Facebook Safety Check operates on smartphones, laptops, tablets, and other mobile devices that may communicate using cellular and/or Wi-Fi networks.

294. Facebook Safety Check provides users the ability to alert a group of recipients

using mobile devices operating on wireless networks.

295. Facebook stores information about user's location, home area, and current area to send Safety Check interrogations based upon user information stored on the Facebook servers.

296. Facebook Safety Check creates groups of recipients and assigns group identifiers corresponding to recipient groups comprising selected members based upon stored information about location and usage.

297. Mobile devices corresponding to group recipients are provided with information about recipients such as members in the affected area, their recipient identifying information, group members marked safe, and members who have yet to respond.

298. Safety Check group messages are transmitted wirelessly to mobile devices corresponding to each recipient in the selected group.

299. Safety Check provides acknowledgement responses indicating to the network client who has seen the group message and who among group members has not.

300. Facebook Safety Check provides acknowledged group messaging.

301. Facebook servers store recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

302. Safety Check group information is stored on user's mobile devices.

303. When Facebook initiates a Safety Check group message, the Safety Check client application causes wireless transmission of a group message to mobile devices corresponding to group recipients, and mobile devices receiving the group message transmit a response.

304. Responses and acknowledgement data are stored for each group member.

305. Mobile devices are updated with current data from the Safety Check control

module.

306. The processing device in the Safety Check control module comprises a processing device at a Safety Check dispatch center to transmit a group message and monitor responses.

307. Facebook Safety Check transmits to the Facebook server system a request for wireless transmission of a group message.

308. Group information is transmitted by the Facebook server system to the Safety Check dispatch center. Such group information relates to the group address, group membership, and/or recipient identifying information.

309. Facebook Safety Check broadcasts group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

310. Facebook Safety Check receives acknowledgement responses from group members via the wireless network being used by the respective user's device. Facebook will see when a message is delivered and when the recipient user sees it, indicating to the network client who has checked in to the group message and who among group members has not.

311. Users may respond to Safety Check group messages with indication of receipt and status.

312. As a result of Facebook's infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that adequately compensates it for Facebook's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT 7
## (INFRINGEMENT OF U.S. PATENT NO. 9,294,888 BY FACEBOOK SAFETY CHECK)

313. GroupChatter incorporates paragraphs 1 through 312 herein by reference.

314. GroupChatter is the owner, by assignment, of U.S. Patent No. 9,294,888 (the "'888 Patent"), titled "METHOD AND APPARATUS FOR EFFICIENT AND DETERMINISTIC GROUP ALERTING."

315. A true and correct copy of the '888 Patent is attached as Exhibit D.

316. As the owner of the '888 Patent, GroupChatter holds all substantial rights in and under the '888 Patent, including the right to grant sublicenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

317. The United States Patent Office granted the '888 Patent on March 22, 2016.

318. The '888 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

319. Facebook is practicing one or more claims of the '888 Patent, including at least claims 1, 2, 3, 4, 7, 8, 9, 10, 11, 12, 13, 16, 17, and 18, by making, using, offering for sale, selling, and/or importing Facebook Safety Check and its subsystems that provide a deterministic group messaging system through which Facebook and its users exchange group messages over cellular, Wi-Fi, WiMAX, wireless broadband, or wireless network.

320. Facebook has directly infringed and continues to infringe the '888 Patent by deploying, testing, using, and operating Facebook Safety Check to provide acknowledged group messaging to users and perform acknowledged group messaging.

321. Facebook Safety Check operates on smartphones, laptops, tablets, and other mobile devices and may communicate using cellular and/or Wi-Fi networks.

322. Facebook Safety Check provides the ability to send group messages to groups of

recipients via mobile devices operating on wireless networks.

323. Facebook stores on its servers data relating to recipients including their location, friends, and home location data.

324. Facebook Usernames and User IDs are part of a user's public profile. Facebook Safety Check uses this information to help people find users and to organize a user information internally on the Facebook Safety Check system.

325. Group information such as check-in status and recipient identifying data stored on the Facebook Safety Check system is provided to mobile devices.

326. Safety Check group messages are transmitted wirelessly to mobile devices corresponding to each recipient in the selected group.

327. Mobile devices running a Facebook client application receive a Safety Check group message and respond with acknowledgement of receipt and read or check-in status.

328. Acknowledgement data such as confirmation of receipt, a read receipt, or indication a reply was sent is stored in memory.

329. Messages are sent to Facebook clients based on stored acknowledgement data in the Safety Check system.

330. Facebook Safety Check broadcasts group messages to members via wireless networks such as cellular or Wi-Fi networks on which network client devices are operating.

331. Facebook Safety Check receives acknowledgement responses from group members via the wireless network being used by the respective user's device.

332. Facebook Safety Check provides acknowledgement responses indicating to the network client at the dispatch center who has seen the group message and who among group members has not.

333. Users may respond to Safety Check group messages with confirmation of receipt to indicate they are safe.

334. When responses indicate a user is not in the affected geographical area, Safety Check changes the Facebook group membership data on the Facebook Safety Check server system and users' mobile devices are updated accordingly.

335. Safety Check provides acknowledged group messaging.

336. Facebook Safety Check stores recipient identifiers for each group member, a group identifier corresponding to recipient groups, and information about membership of recipients in the recipient groups.

337. Safety Check group information is stored on user's mobile devices.

338. In operation, Facebook Safety Check dispatch center monitors group message information relayed by Facebook servers for group message responses and stores acknowledgement data comprising an indication that the group message was received, a group message was read, or a reply was sent by the recipient.

339. As a result of Facebook's infringing conduct described in this Count, GroupChatter has been damaged. Facebook is liable to GroupChatter in an amount that adequately compensates it for Facebook's infringement, which, by law, can be no less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**NOTICE**

340. GroupChatter does not currently distribute, sell, offer for sale, or make products embodying the asserted GroupChatter Patents.

341. GroupChatter instructs its licensees to mark all licensed products sold, distributed, offered for sale, or made under license to the GroupChatter Patents and has undertaken reasonable efforts as required to comply with the notice requirements of 35 U.S.C. § 287.

## NOTICE OF REQUIREMENT OF LITIGATION HOLD

342. Facebook is hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Facebook knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

343. As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored. These sources may also include any personal electronic, digital, and storage devices of any and all of Facebook's agents, resellers, or employees if Facebook's electronically stored information resides there.

344. Facebook is hereby further notified and forewarned that any alteration,

destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Facebook's claims and/or defenses. To avoid such a result, Facebook's preservation duties include, but are not limited to, the requirement that Facebook immediately notify its agents and employees to halt and/or supervise the auto-delete functions of Facebook's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

GroupChatter hereby demands a trial by jury on all claims, issues and damages so triable.

## PRAYER FOR RELIEF

GroupChatter prays for the following relief:

a. That Facebook be summoned to appear and answer;

b. That the Court enter an order declaring that Facebook has infringed the '249 Patent, the '888 Patent, the '207 Patent, and the '659 Patent;

c. That the Court find Facebook's infringement of the '249 Patent was willful and egregious warranting enhanced damages;

d. That the Court grant GroupChatter judgment against Facebook for all actual, consequential, special, punitive, increased, enhanced and/or statutory damages, including, if necessary, an accounting of all damages; pre and post-judgment interest as allowed by law; and reasonable attorney's fees, costs, and expenses incurred in this action; and

e. That GroupChatter be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: July 8, 2016

Respectfully submitted,

**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Ave., Suite 1050
Austin, Texas 78701
512.473.2257 Telephone
512.478.4409 Facsimile

By: ______________________
Cabrach J. Connor
State Bar No. 24036390
Email: cconnor@taylordunham.com
David E. Dunham
State Bar No. 06227700
Email: ddunham@taylordunham.com
Jennifer Tatum Lee
Texas Bar No. 24046950
Email: jtatum@taylordunham.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record below who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) this 8th day of July, 2016.

Deron Dacus
ddacus@dacusfirm.com
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701

Heidi L. Keefe
hkeefe@cooley.com
Sarah B. Whitney
swhitney@cooley.com
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

***COUNSEL FOR DEFENDANT FACEBOOK, INC.***

/s/ Cabrach J. Connor
Cabrach J. Connor